**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---

**SECURITIES AND EXCHANGE COMMISSION**
100 F Street NE
Washington, D.C. 20549,

                                **Plaintiff,**

       **v.**

**JUAN CAMPO a/k/a JOHN CAMPO**,

                                **Defendant.**

**Case No. 1:24-CV-2198**

**JURY TRIAL DEMANDED**

---

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC") in its complaint against Juan Campo, also known as John Campo, ("Campo" or "Defendant"), the former Chief Executive Officer of View Systems, Inc. ("View Systems" or "the Company"), alleges as follows:

**SUMMARY**

1.     From approximately July 2019 through July 2022 (the "Relevant Period"), Campo, the then-CEO of View Systems, perpetrated three fraudulent schemes to create the false impression that View Systems, a publicly traded penny stock company, was actively engaged in potentially lucrative lines of business in order to make it attractive to investors. Throughout the Relevant Period, View Systems earned virtually no revenue, manufactured no products, and had a stock price of less than a penny per share.

2.     First, in 2019 and 2020, Campo repeatedly made and disseminated statements to the public falsely representing that View Systems had acquired Sannabis S. A.S., a Colombian cannabis company, when Campo knew that View Systems had not, and never did, complete this acquisition.

3.      Second, in the fall of 2020—during the height of the Covid pandemic—Campo made and disseminated statements falsely representing that View Systems had developed a temperature screening device, when Campo knew that it had not.

4.      And third, in July 2022, Campo signed and certified View Systems' 2020 annual report with the SEC, which contained a fake audit report that falsely represented that the Company's financial statements had been audited, when he knew the audit was never completed.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to Sections 21(d) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78aa(a)]. Campo, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6.      Venue is proper in this District under Exchange Act Section 27 [15 U.S.C. § 78aa] because violations of the securities laws alleged in this Complaint occurred within this District, including (a) the filing with the SEC of false and misleading documents that Campo signed and (b) purchases and sales of View Systems' stock by residents of this District during the Relevant Period.

## DEFENDANT

7.      **Juan Campo a/k/a John Campo**, age 53, is a resident of Colombia in South America.  Since early July 2019 and through at least the end of the Relevant Period, Campo was the President, CEO, and chairman of the board of directors of View Systems.

8.      During the Relevant Period, Campo drafted and published nearly all View Systems' press releases through a newswire service headquartered in the United States.  He also

drafted and posted all View Systems' tweets, as he was the only individual with access to View Systems' Twitter account.  As CEO, Campo also signed View Systems' quarterly and annual reports filed with the SEC during the Relevant Period.

9.      From approximately 2002 to 2018, before joining View Systems, Campo served as an investor relations consultant to public companies, including View Systems.

## OTHER RELEVANT ENTITY AND PERSON

10.      View Systems is a Colorado corporation.  According to its SEC filings, View Systems' principal place of business was in Greenbelt, Maryland through at least July 13, 2022.

11.      The Company became registered pursuant to Section 12(g) of the Exchange Act beginning in August 1999.  During the Relevant Period, its stock traded on various over the counter markets in the United States under the ticker symbol VSYM, including trading by U.S investors.  On January 19, 2021, the SEC issued an order temporarily suspending trading of View Systems' stock through February 1, 2021 because of questions regarding the accuracy and adequacy of information in the marketplace about the Company and its securities.  After the trading suspension, the stock continued to be sold over the counter until the SEC revoked its registration in December 2022 for failing to file required periodic reports.

12.      During the Relevant Period, View Systems' stock qualified as a "penny stock" as defined under Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] because it did not meet any exemption from the definition under Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1] and was traded on the over-the-counter market for less than $5 per share.  View Systems' annual report on Form 10-K for 2019 ("2019 10-K"), signed by Campo and filed with the SEC on July 2, 2020, states that the Company's stock was considered to be a penny stock.

13.     View Systems' Founder is an individual residing in Arkansas who founded the company that later became View Systems.  View Systems' Founder was the Company's CEO from 1998 until Campo joined View Systems in July 2019.  During the Relevant Period, View Systems' Founder continued to serve on View Systems' board of directors and remained involved with the company.

## FACTS

**A.      Prior to the Relevant Period, View Systems Had a Real Business, but by 2019, It Had Virtually No Operations.**

14.     Prior to the Relevant Period, View Systems had a real business that involved manufacturing and selling security and surveillance products, with its primary product being a concealed weapons detection device known as the ViewScan.  In 2016, however, the Company stopped manufacturing products (except for special orders) and stopped soliciting sales of its ViewScan.  By 2018, the Company had licensed the ViewScan to a third party and stopped selling its products almost entirely.

15.     In July 2019, Campo joined View Systems as President and CEO.  By that time, View Systems had virtually no revenue generating business.  View Systems' 2019 10-K states that its total revenue for 2019 was just $1,400.  View Systems' annual report on Form 10-K for 2020 (the "2020 10-K"), although problematic for the reasons discussed below, still only claimed total revenue of less than $3,000 for 2020.

**B.      *The Sannabis Acquisition Scheme*: Campo Falsely Represented That View Systems Had Acquired Sannabis.**

**1.      Campo Signed a Contingent Agreement for View Systems to Acquire Sannabis in the Future.**

16.     On or about July 9, 2019, View Systems issued a press release announcing that it had entered into a memorandum of understanding to acquire a Colombian company called

Sannabis, S.A.S., a company that Campo had founded and co-owned.  View Systems touted

Sannabis as a "Medical Marijuana Pioneer" that had purportedly obtained "medical marijuana

licenses for seed propagation, cultivation, transformation, and export."

17.    At some point during the period from about July 29, 2019 to June 2021, View

Systems entered into a contingent merger commitment with Sannabis, written in Spanish and

titled "Compromiso de Fusion."  That agreement was signed by Campo on behalf of View

Systems.  This merger commitment required View Systems to direct funding to Sannabis and

made the future merger contingent on that as well as approval by the shareholders of each entity.

As contemplated by the merger commitment, the acquisition would be completed by having

Sannabis be absorbed into View Systems and View Systems issuing shares in equal parts to

Campo and a Sannabis representative, who were both shareholders of Sannabis.

18.    View Systems' acquisition of Sannabis was never completed.  Sannabis was never

merged into View Systems and no shares of View Systems were issued to Sannabis shareholders.

As Campo was a founder and co-owner of Sannabis and was directly involved in the negotiations

between View Systems and Sannabis, he knew this.  In fact, Campo provided sworn testimony in

August 2021 during the SEC's investigation in which he admitted that the merger still had not

been completed as of that date.  View Systems' Founder also testified in the investigation that

View Systems' planned acquisition of Sannabis was never completed.

**2.    Campo Made and Disseminated Numerous Materially False and Misleading
Statements Describing the Potential Future Sannabis Acquisition as
Something That Had Already Happened.**

**a.    Campo Made Misstatements in 2019 Falsely Representing That the
Sannabis Acquisition Had Closed.**

19.    Despite knowing that View Systems had not actually acquired Sannabis, Campo

repeatedly made and disseminated false and misleading statements to the public suggesting that

it had.  These false claims appeared in press releases, View Systems' Twitter posts, and at least

one quarterly report filed with the SEC.  In these statements, Campo also touted Sannabis as an

international player in the "medical marijuana" industry that was poised to "Supply the World's

$14 Billion Hemp Market."  He also falsely represented that Sannabis was actively growing

cannabis, when it was not, and did not have the requisite licenses to do so.  In fact, contrary to

Campo's public statements, during 2019 and 2020, Sannabis' business was limited to making and

selling cosmetics and creams made from hemp seed oil.  And although Sannabis had applied for

licenses from the government of Colombia that would have allowed it to grow cannabis, it did

not actually obtain any such license until at least 2021.

20.     For instance, beginning on or about July 31, 2019, Campo drafted and published a

press release that announced, falsely, that "View Systems Inc. Closes Acquisition of Colombia

Medical Marijuana and Hemp Products Company, Sannabis."  The body of the press release

repeated the false statement that "View Systems, Inc. … announced today the closing for the

acquisition of Sannabis S.A.S. ("Sannabis"), a Colombian medical marijuana and hemp

company."  The press release also falsely stated that "View Systems acquired Sannabis to

diversify into the burgeoning Cannabis industry…"

21.     These false statements had a material effect on View Systems' stock price.  Later

that same day, an article was published in Emerging Growth.com, a company that reports on

small-cap companies.  The article cited to the July 31 press release and was titled "View

Systems, Inc. (OTC Pink: VYSM) up 31% after Closing Acquisition of Colombia Medical

Marijuana and Hemp Products Company, Sannabis."

22.     As of market close on July 31, 2019, the stock price for View Systems increased

over 25%, from $0.0029 to $0.0037 per share, compared to the prior day close.  And the trading

volume for the day was over 16.5 million shares bought and sold, compared to fewer than 25,000 shares traded the day before.

23.     Similarly, on or about August 19, 2019, Campo, as CEO of View Systems, signed a quarterly report on Form 10-Q for the period ended June 30, 2019, falsely representing that View Systems had "acquired a company called Sannabis that grows and ships Cannabis grown for medical and industrial purposes." This statement was false both because an acquisition with Sannabis had not taken place, and because Sannabis was not growing cannabis at all at that time.

24.     Campo repeated the false representation that View Systems *had acquired* Sannabis, in substantially verbatim form, in at least nine more View Systems press releases that he drafted and published between August and December 2019, including on: August 6, 2019; August 8, 2019; October 16, 2019; October 17, 2019; October 18, 2019; October 31, 2019; November 15, 2019; November 22, 2019; and December 5, 2019.

25.     In the August 6, 2019 press release, Campo also falsely referred to Sannabis as belonging to View Systems by using the possessive form to describe the relationship between the two companies, another way of falsely representing that the acquisition had been completed. Specifically, Campo described Sannabis as "View Systems' Medical Marijuana Company Sannabis" while announcing a distribution agreement with a cannabis licensee in Uruguay. The body of that press release contained additional false statements claiming that Sannabis was owned by View Systems by describing it as "*their* medical marijuana company in Colombia" (emphasis added).

26.     Campo repeated the false and misleading descriptions of Sannabis as "View Systems' Sannabis" or "View Systems' subsidiary," nearly verbatim, in at least seven more View Systems press releases (of which six also contained the false "acquired" language, as listed

above) between September and December 2019, including on: September 4, 2019; October 17, 2019; October 18, 2019; October 31, 2019; November 15, 2019; November 22, 2019; and December 5, 2019.

27.     At least some of the false statements about the Sannabis acquisition were highlighted by third parties analyzing the stock.  For instance, on November 15, 2019, another article appeared on Emerging Growth.com that cited to the November 15 View Systems press release and was titled "View Systems, Inc. (OTC Pink: VYSM) up 37% after Sannabis imports Hemp Seeds to Uruguay to Begin Planting Next Week to Supply the World's $14 Billion Hemp Market."

28.     As of market close on November 15, 2019, the stock price for View Systems had increased 38%, from $0.0008 to $ 0.0011 compared to the prior day close, and the trading volume for the day was over 9.4 million shares traded, compared to fewer than 1.4 million shares traded the day before.

> **b.     Campo Signed a Report Filed with the SEC in December 2019 Admitting That the Sannabis Acquisition Had Not Closed.**

29.     On or about December 9, 2019, Campo signed a View Systems quarterly report (Form 10-Q) for the third quarter of 2019 that was filed with the SEC that same day.  In the Form 10-Q, View Systems acknowledged that "[t]he acquisition of Sannabis has not yet closed" and added that "[w]e expect the [Sannabis] acquisition to be complete in the first quarter of 2020." This statement in the SEC filing essentially admits the falsity of all the prior press releases, which described the acquisition as "closing," View Systems having "acquired" Sannabis, or representing Sannabis as belonging to View Systems.  Nevertheless, Campo began the fraud anew the very next month.

c.     **Campo Made and Disseminated Additional Misstatements About the Sannabis Acquisition in 2020.**

30.     On January 13, 2020, for reasons not yet determined, View Systems experienced a sudden increase in its stock price and trading volume.  Specifically, by the market close on that day, View Systems' stock price had increased by 83%, from $0.0006 to $0.0011, and the trading volume increased from less than 30 million to more than 118 million, as compared to the prior trading day of January 10.

31.     Although the immediate cause of this increase in View Systems' trading is unknown, contemporaneous market sources suggest that it reflects the materiality of the planned Sannabis acquisition.  For instance, after the market closed on January 13, 2020, an article was published in Pennystockdream.com, an online newsletter service, with the headline: "View Systems, Inc., (PINK:VYSM) closed up 83.33% Today, As Anticipation Grows Over Planned Merger With Colombian Cannabis Company, 'Sannabis'" and specifically noted that "[a]s per a form 10-Q filed for the quarterly period ended on September 30th 2019, View Systems stated that this merger is expected to be completed in the first quarter of 2020."

32.     On January 14, 2020, the next day, View Systems' stock price closed another 55% higher, at $0.0017, with more than double the trading volume at over 314 million.  After the market closed, another article was published in Pennystockdream.com, with the headline: "After Our Update On View Systems, Inc., (PINK:VSYM) Last Night It Gained As Much As 109.09% Mid-Day Today, And Closed Up 54.55%."  The article cited to View Systems' December 2019 Form 10-Q and noted that "investors are currently anticipating the expected close of a planned merger between View Systems, Inc. and the Colombian Cannabis company, 'Sannabis.'"

33.     Contrary to the claimed expectation in the December 9, 2019 Form 10-Q, which was repeated in the press coverage described above, View Systems did not close the Sannabis

acquisition during the first quarter of 2020 (or ever).  Yet, Campo continued to draft, publish, and disseminate press releases falsely representing that the acquisition had been completed.

34.     For example, on or about January 14, 2020, Campo drafted and published a press release that falsely represented Sannabis as belonging to View Systems: "View Systems, Inc.'s (VSYM) Sannabis is Only Company Planting Cannabis in Uruguay this Season, on Target for 250,000 POUNDS with Plants Growing Nicely to Supply the World with Hemp and CBD Products from Uruguay and Colombia."  Campo repeated this misrepresentation in the body of the press release by referring to Sannabis, once again, as "View Systems, Inc.'s (VSYM), medical marijuana and hemp subsidiary."  He also repeated the specific representation that "View Systems *acquired* Colombian Cannabis company, Sannabis, to diversify into the burgeoning Cannabis industry…" (emphasis added).

35.     Campo repeated his false and misleading descriptions of Sannabis as "View Systems, Inc.'s Sannabis" or View Systems' "subsidiary," or as View Systems as having *acquired*, or been *merged* with, Sannabis, in at least ten more press releases between January and June 2020, including on: January 15, 2020;  January 17, 2020; January 28, 2020; January 31, 2020; February 4, 2020; February 12, 2020; February 21, 2020;  April 8, 2020; June 4, 2020; and June 8, 2020.

36.     Campo also disseminated the June 4 and 8, 2020 press releases by including links to them in posts he made to View Systems' Twitter account on the day of each of these press releases.

37.     Contrary to these representations, Campo eventually admitted—again—that no merger or acquisition of Sannabis had actually been completed.  On or about July 2, 2020, View Systems filed its 2019 10-K with the SEC, in which it acknowledged that no acquisitions were

pending.  Included as an attachment to the 2019 10-K was an unsigned Memorandum of
Understanding that described a future plan of merger between Sannabis and View Systems if
"certain milestones" were met.  This annual report was signed and certified by Campo.

38.     A November 20, 2020 press release that Campo drafted and published also
admitted that the acquisition had not been completed by that time, describing it as something that
View Systems was still "finalizing."

39.     In fact, View Systems never completed any acquisition of Sannabis.

40.     Through the actions described above, Campo knowingly or recklessly deceived
investors and potential investors in View Systems with the false and misleading statements he
made and disseminated representing that View Systems actually acquired Sannabis.

C.     *The ViewScan II Scheme*: **Campo Falsely Represented That View Systems Had a
New Thermal Imaging Product That Could Provide "Real Time COVID
Temperature Results."**

1.     **Background on the COVID-19 Pandemic and View Systems' Planned
ViewScan II.**

41.     In the fall of 2020, at the height of the global COVID-19 pandemic, there was a
sharp increase in the demand for thermal imaging devices, in the hope that such devices could
help detect people who had COVID-19 and thus mitigate the spread of the virus.  As a November
3, 2020 news article noted:

> Since last spring, hundreds of merchants have begun selling telethermographic
> systems—a category that includes dozens of devices such as cameras and kiosks
> that use infrared scanning and thermal imaging to detect body heat from a
> distance.
>
> School administrators, managers of government office buildings and corporations
> have been purchasing the technology and installing it at the entrances of schools,
> hospitals and other buildings in the hope that it will mitigate the spread of Covid-
> 19 by screening out people with fevers, a key symptom of the virus.

42.     In November and December 2020, Campo repeatedly represented in press releases, Tweets, and by sending links to the View Systems website that View Systems had a new thermal imaging temperature screening product, sometimes referred to as the ViewScan II, that could detect temperatures, including those associated with COVID.  He further claimed that View Systems had already received orders for the new product.  These representations were false.

43.     As Campo knew, View Systems had no thermal imaging temperature screening product.  Although View Systems had developed technical designs and other documentation for a new version of the ViewScan that would be wider and more effective, none of these designs or documentation provided for any thermal imaging capabilities.

44.     Campo admitted in testimony in 2021 that he did not know whether View Systems had even reached agreements with any suppliers to provide thermal imaging devices to be incorporated into a future ViewScan system.  In fact, View Systems and at least one View Systems customer, had attempted to find a thermal imaging system that might work with the Company's old ViewScan product, but had been unsuccessful.

45.     Moreover, as Campo admitted in his testimony, at the time of the press releases and other statements discussed below, no ViewScan II had been built.  Campo further admitted that building the ViewScan II was not possible unless View Systems raised capital from investors.  Campo attempted to defend the statements in testimony by asserting that "I still to this day have every optimism that I'll be able to get this done" and claiming that the press releases were "forward-looking" statements.  Yet his false and misleading statements were not mere expressions of optimism or "forward-looking" statements of some future event.  They were factual representations that the product existed already, when he knew it did not.  The public

statements regarding the ViewScan II were also not accompanied by any forward-looking disclaimer languages.

46.     Additionally, although records reflect that View Systems had provided price quotes for "ViewScan II's" to two potential customers in May and November 2020, it never received any actual orders for the product.  Indeed, View Systems' Founder testified that View Systems did not take orders for the ViewScan II because no ViewScan II had been built.

### 2.     Campo Made and Disseminated Numerous Materially False and Misleading Statements About the ViewScan II and Its Thermal Imaging Capabilities.

47.     Despite knowing that no ViewScan II had been built and no ViewScan product had thermal imaging capabilities, Campo drafted and posted a message on View Systems' Twitter feed dated November 19, 2020, announcing: "ViewScan for Stadiums, now with Thermal Imaging Real-Time Temperature Results … More in Press Release tomorrow morning…"

48.     The next day, the promised press release (drafted and published by Campo), announced: "View Systems, Inc. (VSYM)…Launches New Website to Begin Marketing ViewScan II with Real Time Thermal Imaging Temperature Results and other Enhanced Features." and included links to View Systems' website (www.viewsystems.com), which prominently featured the following banner of a thermal-like image of a person wearing a facemask:



Written over banner image were the words, "Introducing Thermal Imaging. Real-Time COVID Temperature Results VIEW SCAN II."

49.    Campo also drafted and published a Twitter post with the same date of November 20, 2020 that contained the same representations about ViewScan II as the press release and a link to the press release.

50.    At the time he drafted and published the November 20 press release and the Twitter post, Campo knew the View Systems website had the COVID temperature results banner because he had seen it.  Additionally, although Campo had the authority to ask the Company's web page designer to change the content of the website, Campo did not ask to change the banner before issuing the press release.  Thus, Campo knowingly disseminated the statement on the website "Introducing Thermal Imaging Real-Time COVID Temperature Results VIEW SCAN II" by linking to that website in his press release.

51.    Once again, Campo's false and misleading representations had an immediate and material impact on the market.  By the close of the market on the day of the November 20 press release and Twitter post, View Systems' stock price increased 133%, from $0.0003 to $0.0007 per share.  And View Systems' trading volume increased from more than 82.6 million on November 19 to nearly 1.3 billion on November 20.

52.    On or about December 11, 2020, Campo drafted and published another View Systems press release that stated that the Company was "raising capital to build the new and improved ViewScan II … to fill *existing international orders*" (emphasis added).  In this press release, Campo again included links to the View Systems website, which Campo knew still displayed the same banner of a thermal-like image of a person wearing a facemask stating, "Introducing Thermal Imaging Real-Time COVID Temperature Results VIEW SCAN II."

53.     Campo also drafted and published a Twitter post dated December 11, 2020 that contained the same representations about ViewScan II and linked to the press release.

54.     And again, Campo's false and misleading representations had a material impact on the market.  By market close on December 11, 2020, View Systems' stock price had increased 50%, from $0.0008 to $0.0012 per share, from the prior day.  And View Systems' trading volume increased from nearly 110 million on December 10 to more than 750 million on December 11.

55.     At the time of these November and December 2020 statements, Campo knew that View Systems had not built any ViewScan II devices and that View Systems had not received any actual orders for the ViewScan II.  In fact, Campo admitted in testimony that the ViewScan II did not physically exist, but that he had been attempting to raise capital from investors so that View Systems could build it (though again, even the ViewScan II designs did not include thermal capabilities).  As part of his fundraising efforts, Campo testified that he sent Private Placement Memoranda to dozens of individuals, including existing View Systems shareholders.  View Systems records reflect that it provided a Private Placement Memoranda with an offering commencement date of March 15, 2021, to at least 26 potential investors from December 2020 through February 2021.  Campo testified that, as a result of his efforts, View Systems obtained at least one $15,000 private placement investment from a U.S. investor, and that, as of August 2021, View Systems was still seeking to raise capital.

56.     Through the actions described above, Campo knowingly or recklessly deceived investors and potential investors in View Systems with the false and misleading statements he made and disseminated regarding the ViewScan II.

D.   *The Fake Audit Report Scheme*: **Campo Signed and Certified a Form 10-K Falsely and Misleadingly Representing That View Systems' 2020 Financial Statements Had Been Audited.**

1.   **Background on View Systems, Its SEC Filings, and Its Auditor.**

57.   As a company whose stock was publicly traded, View Systems was required to file periodic reports with the SEC during the Relevant Period, consisting of quarterly reports on Forms 10-Q and annual reports on Forms 10-K.  However, over time the Company fell significantly behind in filing these reports.  By July 2022, View Systems had not filed its annual reports on Form 10-K for the years ended December 31, 2020 or December 31, 2021, or any quarterly reports on Form 10-Q for any quarter period in 2021 or 2022.  In June 2021, the Company's prior auditor resigned.

58.   In August 2021, View Systems hired a new auditor ("Audit Firm") to audit its 2020 financial statements.  The terms of the audit engagement were set forth in a seven-page letter signed by the managing partner of the Audit Firm ("Audit Partner") and Campo.  One of the terms specified that before View Systems could make any SEC filing with which the Audit Firm was associated, View Systems would notify the Audit Firm, which would then provide a signed copy of its audit report and consent to including it in the filing.

59.   By early July 2022, the audit of View Systems' 2020 financial statements still had not been completed.  In the SEC's investigation, the Audit Partner testified that he had never completed certain substantive audit steps, including completion of the engagement quality review, obtaining a representation letter from management, and conducting a subsequent events review.

60.   On or about July 5, 2022, Campo emailed the Audit Partner requesting that the Audit Firm "send us the 2020 financial statements so we can finish drafting the [Form] 10K.  We

can't file it until you sign off."  The Audit Partner responded to Campo that he had not been paid

for his services, and he did not provide the financial statements.  Campo continued to press the

Audit Partner to provide the 2020 financial statements, noting that doing so would allow View

Systems "to begin preparing the [Form] 10K."

61.     On or about July 11, 2022, View Systems' Founder informed Campo and the

Audit Partner that several investors were waiting for View Systems to become current on its SEC

filings, and that once View Systems did that, they would invest.  Later that morning, the Audit

Partner agreed to have an employee of the Audit Firm provide Campo with a draft set of

financial statements so that View Systems could finalize a draft of the 2020 10-K.  The Audit

Partner testified that, although the financials were provided to Campo, he never provided any

audit report (signed or unsigned) and did not consent to View Systems including an audit report

in the 2020 10-K filed with the SEC.

**2.      Campo Signed and Certified View Systems' Form 10-K for 2020 Despite
         Knowing It Included a Fake Audit Report.**

62.     On or about July 13, 2022, View Systems filed its 2020 10-K, which included

financial statements for 2020.  Campo signed the 2020 10-K and certified under SOX 302 that it

did "not contain any untrue statement of a material fact."

63.     Campo's SOX 302 representation was false because the 2020 10-K described the

financial statements contained in the annual report as having been audited—referring to "[t]he

audited financial statements contained in this Annual Report"—when Campo knew that the audit

was not complete.  In fact, the Audit Partner testified that he had informed Campo on multiple

occasions that he had not completed the audit.

64.     Not only did the 2020 10-K falsely claim that the financials had been audited, it

contained a fake audit report, purportedly by an independent auditor.  This fake audit report was

titled "Report of Independent Registered Public Accounting Firm," and falsely stated "[w]e have audited the accompanying balance sheets of View Systems, Inc. (the "Company") as of December 31, 2020."  The fake audit report then concluded that the financial statements "present fairly, in all material respects, the financial position of the Company as of December 31, 2020," and that the results of View Systems' "operations and its cash flows" were "in conformity" with U.S. GAAP.

65.     The language in this fake audit report appears to be nearly identical to the real audit report that had been included in View Systems' 2019 10-K.  However, unlike the 2019 audit report, the 2020 fake audit report contained no date, no logo, and no name or signature for any audit firm.  When the Audit Partner was shown the fake audit report from the 2020 10-K, he testified that he did not write it.

66.     Although it is not clear who first created the fake audit report, Campo nonetheless engaged in a fraudulent scheme to deceive investors by signing and certifying the Form 10-K that included the fake audit report while knowing, or being reckless in not knowing, that the Audit Firm (a) had not issued any such audit report, (b) had not completed the audit of View Systems' 2020 financial statements, and (c) did not consent to file an audit report with the Company's annual report.

### 3.     Campo Later Admitted the Audit Had Not Been Completed and Tried to Cover His Tracks.

67.      On or about July 25, 2022, Campo emailed the Audit Partner notifying him that the 2020 10-K had been filed and requesting that the Audit Firm provide "an audit opinion" (something that should have been received *before* the 2020 10-K was filed).  In that email, Campo claimed that "it slipped my attention that it was missing" (in fact the report was not "missing," but rather fabricated).  The Audit Partner responded that same day by refusing to

provide the requested audit opinion without additional due diligence, noting "I was surprised that after we discussed and agreed that you only want to review the Financials, you go ahead and file it with SEC. That destroyed all the trust I had in your word. I have to proceed with caution."

68.     The Audit Firm never did complete the audit and Campo took no steps to correct the false and misleading statements in the 2020 10-K regarding the audit.

69.     On or about August 20, 2022 the Audit Firm resigned.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5**

70.     The SEC realleges and incorporates by reference the forgoing paragraphs, as though fully set forth herein.

71.     By reason of the foregoing, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact and/or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers of the securities.

72.     While engaging in the conduct described above, Defendant acted with scienter.

73.     By engaging in the conduct described above, Defendant violated, and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violation of Exchange Act Rule 13a-14

74.     The SEC realleges and incorporates by reference the foregoing paragraphs, as though fully set forth herein.

75.     On July 13, 2022, acting under Section 302 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14], Defendant signed a certification attesting to the accuracy and completeness of an annual report (Form 10-K) filed with the SEC by View Systems.

76.     By engaging in the acts and conduct alleged herein, Defendant filed or caused to be filed on View Systems' behalf an annual report on Form 10-K, which contained certifications signed by Defendant as View Systems' principal executive officer pursuant to Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] and included untrue statements of material fact, or failed to include, in addition to the information required to be stated in such certification, such further material information as was necessary to make the required statements, in light of the circumstances under which they were made, not misleading, or failed to disclose information required to be disclosed therein.

77.     By reason of the foregoing, Defendant violated, and, unless enjoined, will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 13(a)
### and Exchange Act Rules 12b-20, 13a-1, and 13a-13

78.     The SEC realleges and incorporates by reference the foregoing paragraphs, as though fully set forth herein.

79.     As alleged above, View Systems violated Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13, thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] by

filing Forms 10-K and 10-Q filed with the SEC that were untruthful, inaccurate, and/or failed to disclose required material information.

80.     As detailed above, Defendant knowingly or recklessly provided substantial assistance to View Systems' violations by signing and/or certifying those filings that violated Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13, thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

81.     By reason of the foregoing, and pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t], Defendant aided and abetted View Systems' violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13], and, unless enjoined, will continue to aid and abet such violations.

## RELIEF REQUESTED

**WHEREFORE**, the SEC respectfully requests that the Court enter a Final Judgment:

A.     Finding that Defendant violated the federal securities laws as alleged against him in this Complaint;

B.     Permanently restraining and enjoining Defendant and his agents, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise from violating, directly or indirectly, Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13a-14 thereunder [15 U.S.C.§§ 78j(b); § 78m(a); 17 C.F.R. §§ 240.10b-5; 240.12b-20; 240.13a-1, 240.13a-13, and 240.13a-14];

C.     Permanently barring Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §

78l] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. §

78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2)

of the Exchange Act [15 U.S.C. § 78u(d)(2)];

        D.      Permanently restraining and enjoining Defendant from participating in the

offering of any penny stock, including by engaging in activities with a broker, dealer, or issuer

for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any

penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

        E.      Ordering Defendant to pay appropriate civil money penalties pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

        F.      Granting such other further relief this Court deems just, equitable, appropriate, or

necessary in connection with the enforcement of the federal securities laws and for the protection

or benefit of investors.

**JURY DEMAND**

        Pursuant to Federal Rule of Civil Procedure 38, Plaintiff SEC demands a trial by jury on

all issues so triable.


Dated:  July 26, 2024               Respectfully submitted,


Of Counsel:                  U.S. SECURITIES AND EXCHANGE COMMISSION
Christopher Bruckmann
Ashley Sprague                   */s/ Devon Staren*
                              Devon L. Staren
                              D.C. Bar No. 478619
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              100 F. Street NE
                              Washington, D.C. 20549
                              (202) 551-5346 (Staren)
                              StarenD@sec.gov